# UNITED STATES DISTRICT COURT

## District of New Jersey

| TOMAS LLOYD-JONES, an | ) | Case No. |
| individual, | ) | |
| Plaintiff | ) | |
| | ) | |
| -v- | ) | |
| | ) | COMPLAINT |
| DR. HESHAM SOLIMAN NJ | ) | |
| Department of Corrections | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| DR. PERRERA, Regional Medical | ) | |
| Director NJ Department of | ) | |
| Corrections | ) | |
| | ) | |
| And Defendants listed below | ) | |

## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Compliant
   A. The Plaintiff:

Plaintiff TOMAS LLOYD-JONES was, at all times mentioned herein, a prisoner

of the State of New Jersey in the custody of the New Jersey Department of

Corrections.  He is currently living at 153 New Mallery Place, Wilkes Barre, PA

18702.

Plaintiff previously sought informal or formal relief from the appropriate

administrative officials regarding the acts complained of in the Statement of

Claims, below.  Almost daily, when Plaintiff had access to JPAY, Plaintiff

submitted his requests for medical care and to raise concerns regarding the

standard of care he received through the "inquiry" process in place at each

detention facility. While held in the infirmary, Plaintiff repeatedly requested
medical care for his seizures and thumb and requested infirmary staff provide him
with paper "inquiries" to submit his requests for treatment, such requests were
ignored by infirmary staff that reported to Plaintiff that it "wasn't their job" to
obtain paper inquiries for Plaintiff to submit his complaint. On more than one
occasion Plaintiff was forced to make a sign and tape it to the Plexiglas cell in the
infirmary stating "I need to see a social worker". This sign was also ignored.
Plaintiff and his family reached out to the Department of Corrections Patient
Advocate and Ombudsmen. Plaintiff has brought no other civil actions in federal
court while incarcerated.

B. The Defendant(s):

The Doctors and Medical Staff at Northern State Prison including:

DR. SANDRA CONNOLLY

DR. SHARMALIE PERERA

JOSE A TORRESS, CC UMDNJ Regional Office

The Doctors and Medical Staff at New Jersey State Prison – Main:

DR. IHUOMA NWACHUKWU

Lt. Sloan

The Doctors and Medical Staff at Bayside State Prison

DR. SHERITA LATIMORE-COLLIER

DR. CHENNA G. REDDY

The Doctors and Medical Staff at Southern State Prison

DR. JEFFREY POMERANTZ

THE LOURDES GROUP

NEW JERSEY DEPARTMENT OF CORRECTIONS CENTRAL
TRANSPORTATION UNIT – Jose Torres

Each Defendant is sued individually and in his official capacity.  At all times
mentioned in this complaint each Defendant acted under the color of state law.


## II.     Jurisdiction and Venue

This action arises under the United States Constitution and the Civil Rights Act
pursuant to 42 U.S.C. §1983 and the Eighth and Fourteenth Amendments to the
United States Constitution.  This action also arises under New Jersey Constitution
Article 1 Section 12 and New Jersey medical malpractice law.  Jurisdiction of this
Court is invoked under 28 U.S.C. §§1331 and 1343 and the aforementioned
statutory and constitutional provisions.  Plaintiff further invokes the supplemental
jurisdiction of this Court to hear and decide claims arising under state law.  This
Court has supplemental jurisdiction over those claims asserted under state law by
virtue of 28 U.S.C Section 1367.

## III.    Statement of Facts

1.  Prior to June 12, 2018 Plaintiff had no history of seizures.


2.  On June 12, 2018 Plaintiff suffered a Grand Mal Seizure while in his cell (cell
    211) at Northern State Prison ("NSP").  Plaintiff's prison medical records
    indicate Plaintiff's bunkmate witnessed the seizure (See Exhibit 1, pg. 523, "pt
    was at a standing position when pt fell and started to seize.").  Plaintiff was
    taken to the NSP infirmary on a stretcher (see pg. 524) and Plaintiff's medical

record notes: trace foaming on Plaintiff's lips, injury to right cheek bone and right upper eyebrow area, injury to thumb, weakness in right hand and leg, slowness in comprehending commands and minimal ability to perform (pg. 523). Further, Nurse VanLiew noticed Plaintiff in a seizure post-ictal state with weakness to the right leg and hand, slowness to comprehend commands, and minimal ability to perform (pg. 526). Plaintiff was admitted to the infirmary and monitored for additional seizure activity. Plaintiff states his thumb was obviously dislocated and fractured as it was sticking out in an unnatural position. Plaintiff repeatedly requested he be taken to the hospital and called for the nurses all night due to the shaking in his foot. Plaintiff was treated with Motrin, Benadryl and an ice pack.

3. Several months later, while under the care of Dr. Lynch at East Jersey State Penitentiary (EJSP) Plaintiff was told that standard of care for first onset seizure is immediate transport to the emergency room for a CT scan and standard procedure for a dislocated and fractured bone is an x-ray.

4. On June 13, 2018 Dr. S. Mannava's prescription for Plaintiff was further monitoring in the infirmary, neurological testing every two hours for 24 hours, and lab work. The neurological testing Plaintiff received included looking at his pupils, checking the strength in his hands and his ability to balance on one foot. Also on this day Plaintiff's thumb was splinted by Dr. Connolly doctor (pg 516). Dr. Sandra Connolly ordered x-rays for Plaintiff's thumb and a CT-Scan for the seizure activity (pg. 511).

5. On June 14, 2018, despite several nurses recording in Plaintiff's medical record signs and symptoms of seizures, Dr. Connolly disregarded this information and wrote in the medical record: "Late entry – as per my phone call to Mr. Gangi,

administrator (on 6/13/2018), the injuries to the face and right hand
(specifically the right thumb an dulnar region of hand) are suspicious for trauma
related to an assault/fight. *The patient has no injury to the right US, thorax, or
right LE to suggest fall onto the floor and thrashing about in seizure activity
(emphasis added).* (pg. 508). Dr. Connolly also noted in Plaintiff's record that
Plaintiff would require an orthopedic consultation.

6. On June 14, two days after his seizure and injury, Plaintiff received an x-ray on
   his thumb.

7. On June 15 Dr. Connolly released Plaintiff from the infirmary and Plaintiff was
   transferred to Bayside State Prison ("BSP"). Dr. Connolly reviewed the x-ray
   confirming multiple fractures in Plaintiff's right thumb and noted the
   requirement that he receive an orthopedic consultation. Plaintiff was told that
   he may need surgery on his thumb. Plaintiff's chart notes a pending order for a
   CT scan of his brain.

8. On June 15, Plaintiff was received in BSP infirmary and reiterated his
   complaint of "transient paralysis, weakness, paresthesias…jerking of his right
   leg and thigh prior to the seizure incident." (pg 490). Plaintiff's record notes
   the ortho consult and a pending CT scan. He was returned to general
   population after his visit in the infirmary.

9. On June 22 Plaintiff had another seizure while in his cell and admitted to the
   infirmary at BSP. At this time, Plaintiff was given Keppra, an anti-seizure
   medication and Dr. Reddy at BSP ordered Plaintiff transferred to Southern State
   Prison Infirmary ("SSP").

10. On June 23, 2018 Plaintiff was received at Southern State Prison (SSP) and admitted to the infirmary. The intake nurse noted all of Plaintiff's medical complaints in the chart, including numbness and tingling in his right leg, previous episodes of seizures and broken right thumb.

11. After being transferred to SSP Plaintiff started having multiple auras daily. Plaintiff described this to his family as tremors on the right side of his body beginning his in foot and moving up through his leg and right side of his body.

12. Plaintiff also used the standard procedures for reporting medical concerns to alert medical staff of the auras and tremors.

13. On June 26 Plaintiff was transferred out of SSP and returned to BSP where he was in general population.

14. On June 27 plaintiff received a second x-ray on his right thumb.

15. On June 28 Plaintiff's diagnostic review of the x-ray notes "acute right hand fracture." The chart notes a "two-week old" injury to his right thumb and a displaced fracture. The injury to the thumb is in fact 16 days old at this time. The Doctor's recommends open reduction internal fixation surgery as soon as possible. Dr. Shakir stated "you should have had surgery 2 weeks ago" after learning that the break happened on June 12. The thumb would need to be re-broken because it healed in a deformed manner.

16. On June 29, seventeen days after his initial seizure, Plaintiff received a CT Scan indicating a "1.8mm cm hyperdense mass of the high left frontal convexity

abutting the falx." MR Imaging was recommended for further evaluation. This was performed at St. Francis Hospital in Trenton.

17. On July 2, during a routine visit with the BSP Dr. Plaintiff learned of the abnormal CT scan and reported multiple episodes of his right leg going numb, quivering and shaking. An MRI of his head was ordered.

18. On July 3 Plaintiff's mother reported to the Patient Advocate that Plaintiff was having daily focal seizures, increased trembling, numbness and weakness in his right leg. The Patient Advocate reported that appointments for Plaintiff's thumb and MRI for his seizure were made.

19. On July 7, Plaintiff's mother visited Plaintiff at BSP during the regular afternoon visiting hours. During the visit, Plaintiff experienced a seizure in the visitor's hall. Plaintiff's mother observed a full Grand Mal seizure during which Plaintiff was cyanotic and unconscious. Plaintiff was foaming at the mouth and convulsing. His lips turned blue and when he came to he reported that he did not know what happened. Plaintiff's mother witnessed the officers supervising the afternoon visit do nothing to aid the Plaintiff. Plaintiff's mother witnessed other inmates catch and hold Plaintiff during the seizure. Infirmary staff came with a stretcher to take Plaintiff back to the infirmary and assured Plaintiff's mother that they would take care of him. During a subsequent phone call between Plaintiff and his mother, Plaintiff reported that he was rolled back to the infirmary and, not even minutes after having a seizure, was told to go back to his cell. Despite having barely regained consciousness and being unsteady on his feet, Plaintiff was sent to walk alone to his cell. Plaintiff's medical record notes: "Dr. B. Patel, notified. I/m medically cleared to return to

housing unit and i/m to be seen for neuro checks until able to be scheduled for provider. DOC made aware."

20. Less than one hour after being told to return to his cell, on July 7, Plaintiff had another seizure in his cell. This seizure was witnessed by his cell mate who called for the officer. Pg. 408.

21. On July 7, Plaintiff was transferred to SSP Infirmary. pg. 399.  Chart notes from July 10 state:

PT seen on intake. Was moved from SSCF after being in infirmary for increased SWz activity over the weekend. Has been on increased Keppra levels since 7/2 without any noticeable decrease in petiti mal / partial sz activity. PT had EEG scheduled for yesterday but this was missed since he was moved to SSCF over the weekend. PT will be rescheduled. PT has Ortho apt tomorrow at SFMC and will try to get MRI of brain performed as well. Will start Dilantin to see if that helps with increased LE activity. Will give bolyus 400mgx1 add 100mg po BID continu with keppra. Recheck levels next week. Pg 374.

22. On July 11, 30 days after his first reported seizure and thumb fracture, Plaintiff was admitted to SFMC for surgery on his broken thumb. Upon meeting with Dr. Shakir, Dr. Shakir said to Plaintiff that the surgery should have been performed the day of the injury, not a full month after the injury. Plaintiff was told he would need a follow up visit in two weeks and physical therapy. Notes from Dr. Shakir's surgery indicate pins were placed into the thumb and "mobilization and physical therapy in two weeks is key" pg. 352.

23. On July 11 Plaintiff received an MRI on his brain and diagnosis was changed to Meningioma (this would prove to be an incorrect diagnosis).

24. There was no post-op follow-up after Plaintiff's hand surgery and no physical therapy. Plaintiff had to undergo a second hand surgery on October 1, 82 days after the first surgery and 111 days after the initial injury for a for a second surgery to correct damage from having not received the proper follow up care after the first surgery. During the 83 days after the thumb surgery, Prison doctors and nurses failed to remove the cast or clean the wound. The wound became infected and started to ooze pus and smell. The pins inserted into Plaintiff's thumb started to push their way out through his skin. This is noted and documented in plaintiff's medical record and the prison took no steps to treat his infection, clean his wounds, and provide proper post-surgical follow on care.

25. On July 16, 5 days after receiving the MRI results, Dr. Pomerantz ordered a neurosurgeon consult for possible meningioma tumor.

26. On July 19, 8 days after the MRI results were received, and three days after Dr. Pomerantz ordered the neurosurgeon consult, nurse Poonam Malani placed an order for a neurosurgeon consult (pg. 347-348).

27. On July 25, Plaintiff's mother called the patient advocate to remind her of the two-week follow up on Plaintiff's hand surgery. Plaintiff's mother left detailed messages regarding the need for Plaintiff to have post-op care on his thumb and see a neurosurgeon with the Patient Advocate on August 8, August 13, 14, and 15.

28. On August 23, 40 days after being told he should see a neurosurgeon as soon as possible, Plaintiff has an appointment with a neurosurgeon.

29. On August 19, Plaintiff's mother visited Plaintiff at SSP. He reported to her the increased focal seizures (between 25-30 a day) and his requests via JPAY to see Dr. Pomerantz. Plaintiff's mother also witnessed a swollen and infected thumb that had not received proper care after surgery.

30. On August 23 Plaintiff went to the infirmary to have his thumb cleaned and cared for. The wound never fully healed. The nurse attempted to remove the cast, which should have been removed much sooner, but it was stuck to the wound underneath and was developing an infection. Plaintiff also complained of his right leg and how he could not make it move (pg 311). Dr. Pomerantz was told to see Plaintiff on 8/23 by his supervisors because of the constant phone calls made by Plaintiff's mother to the patient advocate, Maggie Reed. During these phone calls, Plaintiff's mother conveyed the urgency of seeing a Dr. because of worsening seizure activity.

31. On August 24 Plaintiff was transferred to University Hospital Newark Emergency Room because Dr. Pomerantz was not able to diagnose or treat Plaintiff. Dr. Pomerantz told Plaintiff he had a neurosurgeon appointment on September 12, but was sending him to the ER anyway because of the agitation raised by Plaintiff's mother.

32. On August 24 the Patient Advocate called Plaintiff's mother to report that he had been taken to the emergency room at UMDNG on August 23 for observation and an overnight stay.

33. On August 27, a nurse from UMDNJ called Plaintiff's sister with a message from Plaintiff: "I'm OK. I love you all." The nurse would not say anything more. Plaintiff's chart from 8/27 states: PT is still at UH and now on G Blue 973 972 5628. I spoke with the nurse and was told that the patient is in the OR as of writing but won't tell me what the procedure is."

34. On August 29 Plaintiff's chart reads: Per Dr. Clark: pt is in recovery s/p craniotomy & resection; frozen section reveals high grade glioma – routine path pending; pt will need adjuvant chemo & rads. Pg. 302.

35. On August 29, Dr. Amanda Carpenter, neurosurgery fellow at UMDNJ called Plaintiff's mother to report he had brain surgery on August 27 and that the brain tumor was fully removed. No diagnosis was given, but Dr. Carpenter told Plaintiff's mother that Plaintiff did not have meningioma and that the tumor was very aggressive and malignant. Dr. Carpenter reported that Plaintiff would need an oncologist and need to be scheduled for radiation and chemotherapy.

36. On August 31 Plaintiff was discharged from hospital and admitted to East Jersey State Prison (EJSP). It was noted there were 22 staples stretching from left to right across the head.

37. On September 1 Plaintiff's sisters visited him while at the EJSP infirmary and saw that Plaintiff's right thumb was swollen, red, white puss had formed near the incision site and the pins placed during surgery were poking out of his hand.

38. On September 6, 2018 Dr. Scott Miller wrote in his orthopedic consultation:

The Plaintiff is a 39-year-old male. He apparently had ORIF of an angulated fracture of the right thumb. Unfortunately, I was provided no records from the operative procedure nor have there been any x-rays taken of the hand since surgery.

Surgery was performed on July 11, 2018. The main complaint is that the finger has soft tissue swelling and diminished mobility. The patient is also complaining of some mild erythema, which I could not appreciate on the television screen.

I noted that he was able to flex the finger. I could tell that there were some pin sites where the pin was starting to poke through the skin. Unfortunately, there have been no x-rays taken since surgery. So, I cannot comment on the amount of healing or even if supposed to have mobility in the finger. The patient is from New Jersey State prison. I would recommend that a new x-ray to be taken of the finger. The patient could be referred to any one of the multiple clinics at New Jersey State Prison that occur every month for followup. I do not understand the delay and waiting almost 2 months following surgery to schedule what should have been a 2-week routine followup appointment. Pg. 223.

Dr. Miller ordered the antibiotic Cipro after seeing the thumb injury via Skype. He was concerned about a Staph infection.

39. On September 20, 2018 Plaintiff saw the hand surgeon from the original surgery who advised plaintiff that he would need a follow up. Plaintiff's chart notes "there is going to be significant limitation in his range of motion on a permanent basis due to this injury and immobilization." Pg. 120. Further Dr. Shakir wrote: This is now almost 3 months postop and this is his first clinic visit. Patient should receive physical therapy immediately after surgery.

40. On September 27 NSP-Main Dr. Ihuoma Nwachukwu had a telephone conference with Dr. Brewer, and UH neurologist Dr. Weiner. Dr. Weiner

explained Plaintiff has high grade glioma, grade 4 glioblastoma which is aggressive. Treatment is radiation and chemotherapy with 27% survival rate for two years with this treatment. Average survival is 14-16 months. Despite this diagnosis Plaintiff's current medical record is not changed to reflect he has glioblastoma and not meningioma.

41. Grade 4 Glioblastoma is a serious form of brain cancer. Research suggests early detection of this form of brain cancer can have a major impact on the life expectancy of the patient, especially when the patient is under 40 years old. Between the time of the original CT scan and the brain surgery the mass on Plaintiff's brain grew significantly.

42. On October 1 a full 111 days after the initial injury and 82 days after the first hand surgery, a second hand surgery was performed.

43. October 10, Plaintiff begins 30 day regimen of radiation therapy treatment. Radiation treatment requires transportation Monday-Friday to the hospital. To prepare for transportation Plaintiff is awoken at 4:30AM and taken to a central holding cell with all other inmates that require transportation that day. Plaintiff is transported in a crate similar to a dog kennel where his arms and legs are shackled so as to immobilize them. Plaintiff must ride in the van, shackled in this manner, in some cases up to 6 or more hours while the drivers take other inmates to court appearances or other facilities. On some occasions the temperature in the van has been turned to its highest setting and Plaintiff has been left to sweat for hours while drivers prepare their route for the day. Plaintiff often returns after 1PM while the facility is in lockdown to allow prison officials perform daily counts. In some cases, Plaintiff could be left

sitting in the van for several hours upon return waiting for lockdown to end so he can enter the facility. On days when Plaintiff leaves for radiation treatment early and returns after 1 he misses both breakfast and lunch. Having proper nutrition is critical for someone undergoing radiation and chemotherapy. With an immune system compromised by his brain cancer and the radiation and chemotherapy Plaintiff has on multiple occasions requested alternate transportation arrangements. Plaintiff's own oncology Doctors at UMDMJ have requested alternate transportation methods. However, all requests have been refused by Mr. Jose Torres. Being shackled with both his arms and legs bound and unable to move, and while in the crate, Plaintiff is unable to protect himself in the event of a seizure and fears his head banging into the metal bars of the crate. This form of transportation has caused Plaintiff to suffer mental anguish, fear, anxiety, humiliation, and depression.

44. Defendant's actions amount to a deliberate indifference to Plaintiff's medical conditions.

45. Defendants delay in treating both Plaintiff's brain tumor and his broken thumb, a delay had no medical necessity.

46. Defendant's actions amount to medical negligence.

47. Defendant's failure to follow the standard of care for treatment have caused and/or contributed to Plaintiff sustaining permanent and irreversible injuries to his thumb and life expectancy.

48. Defendant's failure to follow the standard of care for treatment have caused or contributed to Plaintiff suffering repeated grand mal seizures and daily petit mal seizures.

49. Defendant's failure to follow the standard of care for treatment has caused and/or contributed to the further deterioration of Plaintiff's mental and physical health.

50. Defendant's failure to follow standard of care and provide a transportation alternative for Defendant has causes physical and mental suffering.

IV.   Request for Relief

Plaintiff requests actual and punitive damages in the amount of Ten Million Dollars.

Recovery of all costs and attorney's fees (Plaintiff is respectfully requesting an attorney be appointed); and any additional relief this court deems just, proper, and equitable.

V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and believe, that this complaint (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law: (3) the factual contentions have evidentiary support, or if specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Signed this _15th_ day of _January_, 2020.

Tomas Lloyd-Jones by

Signature of Plaintiff

Page 15 of 15