UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Linda Lloyd-Jones and Jessica Llyod-Jones McCormack on behalf of THE ESTATE OF TOMAS LLOYD-JONES,<br><br>Plaintiff,<br><br>v.<br><br>SANDRA CONNOLLY, JEFFREY POMERANTZ, SUMALATHA MANNAVA, SHERITA LATIMORE-COLLIER, POONAM MALANI, MARCIA DOUGLAS, DARLENE SOSA, CONNIE PURCELL, BHARATKUMAR PATEL, MARCUS O. HICKS, GEORGE ROBINSON, JOHN POWELL, C. RAY HUGHES, JOHN AND JANE DOES 1-10, individually and in their official capacities, and ABC ENTITIES 1-10,<br><br>Defendants. | Civil Action No. 20-00912-SDW-LDW<br><br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Linda Lloyd-Jones and Jessica Llyod-Jones McCormack on behalf of The Estate of Tomas Lloyd-Jones ("Plaintiff"), for the second amended complaint against Defendants Sandra Connolly, M.D., Jeffrey Pomerantz, D.O., Sumalatha Mannava, M.D., Bharatkumar Patel, M.D., Sherita Latimore-Collier, M.D., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., Connie Purcell, R.N., Marcus O. Hicks, George Robinson, John Powell, C. Ray Hughes, John and Jane Does 1-10, individually and in their official capacities, and ABC Entities 1-10 (collectively, the "Defendants"), avers as follows:

<u>INTRODUCTION</u>

1.      Linda Llyod-Jones and Jessica Llyod-Jones McCormack are the administrators of the Plaintiff the Estate of the Tomas Lloyd-Jones ("Plaintiff"), who passed away shortly after the amended complaint was filed.  Tomas Llyod-Jones (the "Decedent") was formerly an inmate at

certain adult correctional facilities of the New Jersey Department of Corrections ("NJDOC"), where he was jailed for non-violent crimes until his release from prison in 2019. While alive, the Decedent brought this action because the Defendants – doctors, nurses, administrators, and officials within the NJDOC system – were deliberately indifferent to his serious medical needs while he was an inmate and/or actively and negligently instituted a culture and practice of deliberate indifference through operational decisions and improper training. As a direct result of that indifference, the Decedent suffered from a fractured hand as well as brain cancer which eventually ended his life on June 20, 2020.

2.      This is not a case of a disagreement between Plaintiff and the Defendants over the type of medical treatment that the Decedent received. Nor is this a case about some minor grievance by a prison inmate. Rather, this is a case in which the Decedent needed immediate medical testing and treatment to address serious and life-threatening issues but did not receive it in violation of his Constitutional and statutory rights.

3.      The Decedent's ordeal began on June 12, 2018, when, without warning, he suffered a seizure in his prison cell, fell onto the floor, hit his head, and suffered a severe thumb injury. Over the next two months, he was shuffled in and out of different infirmaries within the NJDOC facilities, but his thumb injury went largely ignored and, worse, he began suffering additional seizures, feeling numbness throughout his body, and having constant migraine auras.

4.      After the initial seizure, the Decedent was not taken to the hospital for testing. In fact, the Decedent was not given a CT head scan until several weeks after his initial seizure. The scan showed that the Decedent had a mass lesion on his brain. Yet even then no immediate action was taken. It was not until some *two months* after that scan that the Decedent was finally sent to consult with a neurosurgeon – during which time the lesion (tumor) had doubled in size.

5. The neurosurgeon performed surgery and removed the tumor from the Decedent's brain, but it was too late. The tumor proved to be cancerous and aggressive. Plaintiff eventually died of brain cancer on June 20, 2020.

6. Prisoners with medical needs are the ultimate captive audience. They have to rely on prison officials, administrators, and medical staff to care for their needs. Thus, under the law, the Defendants were obligated to ensure that the Decedent received the proper testing, diagnoses, and treatment for his seizures and thumb injury, which would have alleviated the pain the Decedent was experiencing and, more importantly, given him a fighting chance at treating and surviving the cancerous tumor that was growing in his brain.

7. Instead, as outlined below, despite the repeated pleas of the Decedent and his family for more immediate testing and treatment, Defendants ignored those pleas and showed deliberate indifference to the Decedent's acute medical needs.

8. Further, the NJDOC's leadership has fostered a persistent and acute environment, through operational decisions and improper training, among other things, in which inmates are looked upon as less than human and unworthy of even the most basic medical treatment. This negligent leadership lead directly to the Decedent's injuries.

9. Plaintiff therefore brings this action against the Defendants under the federal Civil Rights Act, 42 U.S.C. 1983, to redress violations of the Decedent's rights under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment. Plaintiff also brings state law claims against the Defendants under the New Jersey Constitution, and for medical negligence and the intentional infliction of emotion distress.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a) because the matters in controversy arise under the Constitution and laws of the United States.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. 1367(a).   In addition, this Court also has jurisdiction over Plaintiff's state law claims under the federal diversity statute, 28 U.S.C. 1332(a), given that (i) the Decedent was a citizen of Pennsylvania when this action was commenced, (ii) the Defendants are all citizens of the State of New Jersey, and (iii) the matter in controversy exceeds $75,000.

12.     Venue is proper in this Court under 28 U.S.C. 1391(b), in that a substantial part of the events giving rise to Plaintiff's claims occurred in the District of New Jersey.

## THE PARTIES

13.     The Decedent was a 41-year-old male of Panamanian decent and a former inmate in the NJDOC system.   He was released from prison in 2019, and at the time this action was commenced, he resided at 153 New Mallery Place, Wilkes Barre, Pennsylvania 18702.

14.     Defendant Sandra Connolly, M.D., was at all relevant times the Medical Director at Northern State Prison in Newark, New Jersey, who was responsible for treating the Decedent and acted under color of state law as an agent for the NJDOC.   Plaintiff sues Dr. Connolly in her official and individual capacities.   Upon information and belief, Dr. Connolly is a resident of the State of New Jersey.

15.     Defendant Jeffrey Pomerantz, D.O., was at all relevant times the Medical Director at Southern State Correctional Facility in Maurice River, New Jersey, who was responsible for treating the Decedent and acted under color of state law as an agent for the NJDOC.   Plaintiff

sues Dr. Pomerantz in his official and individual capacities.  Upon information and belief, Dr. Pomerantz is a resident of the State of New Jersey.

16.     Defendant Sherita Latimore-Collier, M.D., was at all relevant times a medical doctor responsible for treating the Decedent at Bayside State Prison in Leesburg, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Dr. Latimore-Collier in her official and individual capacities.  Upon information and belief, Dr. Latimore-Collier is a resident of the State of New Jersey.

17.     Defendant Sumalatha Mannava, M.D., was at all relevant times a medical doctor responsible for treating the Decedent at Northern State Prison in Newark, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Dr. Mannava in her official and individual capacities.  Upon information and belief, Dr. Mannava is a resident of the State of New Jersey.

18.     Defendant Bharatkumar Patel, M.D., was at all relevant times a medical doctor responsible for treating the Decedent at Bayside State Prison in Leesburg, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Dr. Patel in his official and individual capacities.  Upon information and belief, Dr. Patel is a resident of the State of New Jersey.

19.     Defendant Poonam Malani, R.N., was at all relevant times a registered nurse responsible for treating the Decedent at Southern State Correctional Facility in Maurice River, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Ms. Malani in her official and individual capacities.  Upon information and belief, Ms. Malani is a resident of the State of New Jersey.

20.    Defendant Marcia Douglas, R.N., was at all relevant times a registered nurse responsible for treating the Decedent at Southern State Correctional Facility in Maurice River, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Ms. Douglas in her official and individual capacities.  Upon information and belief, Ms. Douglas is a resident of the State of New Jersey.

21.    Defendant Darlene Sosa, R.N., was at all relevant times a registered nurse responsible for treating the Decedent at Southern State Correctional Facility in Maurice River, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Ms. Sosa in her official and individual capacities.  Upon information and belief, Ms. Sosa is a resident of the State of New Jersey.

22.    Defendant Connie Purcell, R.N., was at all relevant times a registered nurse responsible for treating the Decedent at Southern State Correctional Facility in Maurice River, New Jersey, and acted under color of state law as an agent for the NJDOC.  Plaintiff sues Ms. Purcell in her official and individual capacities.  Upon information and belief, Ms. Purcell is a resident of the State of New Jersey.

23.    Defendant Marcus O. Hicks was at all relevant times the Acting Commissioner of the NJDOC, and acted under color of state law.  Mr. Hicks is now the Commissioner of the NJDOC.  During the relevant period, Mr. Hicks oversaw all of the correctional facilities within the NJDOC, and was responsible for the development, promulgation, and implementation of policies, procedures, and standards for the correctional facilities within the NJDOC.  Mr. Hicks was also responsible for the budget of the NJDOC's Health Services Unit and its employees and agents.  Plaintiff sues Mr. Hicks in his official and individual capacities.  Upon information and belief, Mr. Hicks is a resident of the State of New Jersey.

24.     Defendant George Robinson was at all relevant times the Administrator of Northern State Prison in Newark, New Jersey, and acted under color of state law.  Mr. Robinson was responsible for supervision and oversight of Bayside State Prison, including, without limitation, the development, promulgation, and implementation of policies, procedures, and standards for the prison.  Plaintiff sues Mr. Robinson in his official and individual capacities. Upon information and belief, Mr. Robinson is a resident of the State of New Jersey.

25.     Defendant John Powell was at all relevant times the Administrator of Bayside State Prison in Leesburg, New Jersey, and acted under color of state law.  Mr. Powell was responsible for supervision and oversight of Bayside State Prison, including, without limitation, the development, promulgation, and implementation of policies, procedures, and standards for the prison.  Plaintiff sues Mr. Powell in his official and individual capacities.  Upon information and belief, Mr. Powell is a resident of the State of New Jersey.

26.     Defendant C. Ray Hughes was at all relevant times the Administrator of Southern State Correctional Facility in Maurice River, New Jersey, and acted under color of state law.  Mr. Hughes was responsible for supervision and oversight of Southern State Correctional Prison, including, without limitation, the development, promulgation, and implementation of policies, procedures, and standards for the prison.  Plaintiff sues Mr. Hughes in his official and individual capacities.  Upon information and belief, Mr. Hughes is a resident of the State of New Jersey.

27.     At all relevant times herein, defendants John and Jane Does 1-10 are yet to be identified individuals who worked for the NJDOC and/or its contractors.

28.     At all relevant times herein, defendants ABC Entities 1-10 are yet to be identified governmental and/or corporate entities.

## GENERAL ALLEGATIONS

29.     Prior to June 12, 2018, the Decedent had no history of seizures.

30.     On June 12, 2018, however, while the Decedent was an inmate at Northern State Prison in Newark, New Jersey, he suffered an epileptic seizure in his cell room.

31.     The seizure caused the Decedent to fall and hit his head on a metal structure in his cell.  As a result, he briefly lost consciousness, and sustained an injury to his right cheek bone and right eyebrow areas, with swelling on both areas.  The fall also caused a severe injury to the Decedent's right thumb, which was sticking out in an unnatural position.

32.     The seizure was witnessed by the Decedent's cellmate, who alerted the officer outside the cell door about the Decedent's condition.  Around 20 minutes later, the Decedent was taken to the prison infirmary on a stretcher.

33.     At the infirmary, the Decedent was examined by two nurses: Muktar Yusuff, R.N., and Valeria VanLiew, B.S.N.  Nurse Yusuff observed that the Decedent's balance was "abnormal" and that he had swelling above the right eye and right cheek bone areas.  Nurse VanLiew observed that the Decedent had an "abnormal" gait and balance, and that his right leg had limited motion due to "a spasm."  Nurse VanLiew further observed that the Decedent was "[s]low to comprehend commands."  The Decedent's medical records from the prison further note that there was trace foaming on his lips.

34.     The medical staff notified Sumalatha Mannava, M.D., about the Decedent's condition, and Dr. Mannava ordered that the Decedent be admitted to the infirmary and monitored for additional seizure episodes.  Dr. Mannava declined to send the Decedent to the hospital.  Nor did Dr. Mannava order any tests to be taken of the Decedent's head as a result of the seizure.

35.     The Decedent was therefore locked in a room in the infirmary and his mattress was put on the floor due to his seizure.  He began complaining throughout the night that his right thumb was in excruciating pain, and that he was feeling tremors in his right foot.  The Decedent repeatedly requested that he be taken to the hospital.  But the medical staff in the infirmary ignored the request.  In addition, other than over-the-counter pain medication (Motrin, Benadryl, and an ice pack), no immediate treatment was provided to the Decedent for his thumb.

36.     The next day, June 13, 2018, the Decedent was examined by Sandra Connolly, M.D.  Dr. Connolly put the Decedent's thumb in a spica splint.  Dr. Connolly told the Decedent that an x-ray of his thumb would be ordered.

37.     Dr. Connolly also noted in the Decedent's medical record that a CT head scan would be ordered and taken on some future date, but no such scan was taken at that time.  Dr. Connolly did not send the Decedent to the hospital for testing or treatment with regard to his seizure.

38.     Dr. Connolly noted in the Decedent's medical record that she had a phone conversation on June 13 with Anthony Gangi, the Assistant Superintendent of Northern State Prison.  According to her own notes regarding that conversation, Dr. Connolly indicated to Mr. Gangi that she did not believe the Decedent had suffered a seizure or that he fell to the floor.  Rather, she believed that his injuries were "suspicious for trauma related to an assault/fight."  Upon information and belief, she also expressed these views to the nurses and other medical staff in the infirmary.

39.     Dr. Connolly's plainly erroneous and unjustified belief that the Decedent was somehow lying about his seizure would have grave consequences for the Decedent – as no tests would be conducted on him with respect to his seizure for several weeks, and surgery for the

cancerous tumor on the Decedent's brain ultimately would not be performed for over two months.

40.     On June 14, 2018, the Decedent received an x-ray on his thumb, and was told that he had multiple fractures.  Dr. Connolly reviewed the x-ray and noted that the Decedent should receive an orthopedic consultation.  No further treatment was provided at that time.

41.     That same day, Dr. Connolly received a phone call indicating that the Decedent would be transferred to another facility within the New Jersey Department of Corrections.  Dr. Connolly believed that the Decedent was medically stable and could be transported.  Dr. Connolly did not, however, send the Decedent to the hospital for testing relating to the seizure.

42.     On June 15, 2018, the Decedent was transferred to Bayside State Prison in Leesburg, New Jersey.  After a physical examination at that facility by Joseph Bentivegna, A.P.N., the Decedent was sent to the general prison population at Bayside State Prison.

43.     On June 22, 2018, the Decedent experienced another seizure at around 9:00 PM, which started in his right leg, migrated up his body, and caused the Decedent to pass out.

44.     The Decedent was admitted to the infirmary at Bayside State Prison and was given Keppra (levetiracetam), an anti-seizure medication.  The Decedent was again not sent to the hospital, and thus, neither a CT head scan nor any other testing of the Decedent's head was performed.

45.     The next day, on June 23, 2018, the Decedent was transferred to the infirmary at the Southern State Correctional Facility in Maurice River, New Jersey, adjacent to Bayside State Prison.

46.     Upon admission to that infirmary, the Decedent was examined by Marcia Douglas, R.N.  The Decedent complained to Nurse Douglas that he had "numbness and tingling" in his right leg, but no medical actions were taken at that time.

47.     Around that time, the Decedent started having multiple migraine auras daily.  The Decedent described feeling "tremors" on the right side of his body beginning in his foot and moving up through his leg and up the right side of his body.  The Decedent reported his symptoms to the medical staff in the infirmary.

48.     The pain in the Decedent's right thumb was also increasing, and he complained to Connie Purcell, R.N., that the medication he was being provided in the infirmary (Ibuprofen) was not helping to alleviate the pain.

49.     Except for over-the-counter pain medication, the Decedent did not receive any treatment or medications while at the Southern State Correctional Facility infirmary.  The Decedent was returned to Bayside State Prison on June 26, 2018.

50.     By that time, the Decedent, when he was able to, had begun reporting his seizures, the migraine aura symptoms, and the pain he was experiencing in his thumb through the NJDOC's JPAY kiosks pursuant to the NJDOC's grievance policies and procedures.

51.     The Decedent's family, including his mother, Linda Lloyd-Jones, also began making numerous phone calls to prison administrators, doctors, and others within the NJDOC in an attempt to have the Decedent be taken to a hospital for appropriate treatment for his seizures and his fractured thumb.  Ms. Lloyd-Jones sent a letter to the Jeffrey Lenox, the Director of Citizens Services and Relations to the Office of the New Jersey Attorney General.  Mr. Lenox directed her to contact Dan DeBeneditti, the Ombudsman for the NJDOC, which she did.  She also contacted Margaret Reed, an advocate/prison liaison for patients in the NJDOC system.  Ms.

Lloyd-Jones had numerous (sometimes daily) conversations with both Mr. DeBeneditti and Ms. Reed about the medical care that the Decedent needed but was not receiving.  The Decedent's family was assured that the necessary tests and treatment had been ordered.

52.     On June 28, 2018, the Decedent met with Dr. Ahmar Shakir, an orthopedic surgeon, and received a second x-ray on his right thumb.  The x-ray showed an "acute right hand fracture."  Dr. Shakir told the Decedent that he should have had surgery two weeks earlier because the delay had caused the fracture to heal improperly, and thus Dr. Shakir would have to re-break the Decedent's thumb and set it property during surgery.  Dr. Shakir recommended that the Decedent have open reduction internal fixation surgery "as soon as possible."

53.     On June 29, 2018, the Decedent finally received a CT head scan.  The scan was interpreted by a radiologist, Glenn Articolo, M.D., who indicated that the scan showed a "1.8 cm hyperdense mass of the high left frontal convexity abutting the falx."  Dr. Articolo recommended that an MRI be taken for further evaluation.

54.     Back at Bayside State Prison, the Decedent informed Brooke Smith, RN, about his ongoing numbness and abnormal feelings in his right leg.  He also informed Nurse Smith that he wanted to speak to the doctors about his CT scan results and his "multiple concerns."  Nurse Smith indicated that she would schedule an appointment.

55.     Several days later, on July 2, 2020, the Decedent discussed his CT scan results with Sherita Latimore-Collier, M.D., who informed him that the scan had produced an "abnormal result."  Dr. Latimore-Collier also informed the Decedent that she would increase his Keppra medication "till repeat imaging is performed."  Despite the Decedent's concerns about his ongoing numbness, the ongoing seizures, and the fact that the CT scan had detected a mass lesion on his brain, Dr. Latimore-Collier did not send him to the hospital for an MRI test or

otherwise order additional testing to further evaluate the mass lesion found on the Decedent's brain.

56.     On July 7, 2018, the Decedent experienced another seizure while his mother was visiting him in the visitor's hall at Bayside State Prison.  During the seizure, his right leg began to tremble and he lost the ability to control the leg or move it.  The Decedent began foaming at the mouth and convulsing.  His lips turned blue and when he regained consciousness, he stated that he did not know what happened.  After about five minutes, he was taken to the infirmary in a stretcher.

57.     Later that night, however, despite being unsteady on his feet, the Decedent was returned to his cell.  A nurse in the infirmary notified Bharatkumar Patel, M.D., of the Decedent's condition.  Once again, however, the Decedent was not taken to the hospital and no further action was taken.

58.     Less than one hour after being returned to his cell, the Decedent experienced yet another seizure in his cell.  His cellmate called for the officer to help.  Upon learning of this latest seizure, Dr. Patel directed that the Decedent again be transferred to the infirmary at the Southern State Correctional Facility, and that his anti-seizure medication be adjusted.  But no further testing or other actions were taken.

59.     On July 11, 2018, one month after his initial seizure and thumb fracture, the Decedent was admitted to St. Francis Medical Center in Trenton for surgery on his broken thumb.  Dr. Ahmar Shakir performed the surgery and wanted the Decedent to return for a follow-up visit in two weeks, and for the Decedent to begin a physical therapy program.

60.     However, there was no post-operation follow-up after the hand surgery.  Nor was there any physical therapy.  In fact, the doctors and nurses at the Southern State Correctional

Facility – including Jeffrey Pomerantz, D.O., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., and Connie Purcell, R.N. – failed to remove the cast on the Decedent's right hand or properly clean the wound after the surgery.

61.     As a result, the wound eventually became infected and started to ooze pus and smell.  Moreover, the pins inserted into the Decedent's thumb started to push their way out through his skin.  The above-referenced defendants took no steps to treat his infection, clean his wounds, or provide proper post-surgical care.

62.     On July 11, 2018, on the same day that the Decedent was at St. Francis Medical Center for his hand surgery, an MRI was finally taken of his brain – one month after the initial seizure and nearly two weeks after Dr. Articolo had found a mass lesion on the Decedent's brain and recommended that an MRI be taken for further evaluation.  The MRI was interpreted by Akbar Fakhir, M.D., who concluded that the MRI findings "likely represent meningioma however follow-up is recommended."  A meningioma is a type of brain tumor.

63.     Shortly thereafter, Jeffrey Pomerantz, D.O., the Medical Director at Southern State Correctional Facility, discussed the MRI results with the Decedent and informed him that he likely had a meningioma and that he might need brain surgery.  Dr. Pomerantz referred the Decedent to a neurologist, Dr. Javier Taboada, who is affiliated with St. Francis Medical Center.

64.     On or about July 15, 2018, the Decedent met with Dr. Taboada.  Upon viewing the MRI results, Dr. Taboada recommended that the Decedent consult with a neurosurgeon as soon as possible.  Dr. Taboada opined that the neurosurgeon would likely want to remove the tumor through surgery and do a biopsy.  He believed that was the Decedent's best course of action.

-14-

65.     Accordingly, on July 19, 2018, Poonam Malani, R.N., entered an order in the system for the Decedent to have a consult with a neurosurgeon.  However, despite the fact that the Decedent had a brain tumor that needed to be immediately removed, neither Dr. Pomerantz nor Nurse Malani (nor anyone else within the NJDOC system) followed up on the order – and, thus, the Decedent was not taken to see a neurosurgeon *until well over a month later*, until August 23, 2018.

66.     Between July 25, 2018 and August 17, 2018, the Decedent's mother, Plaintiff Linda Lloyd-Jones, called Margaret Reed, the patient advocate/prison liaison, at least six separate times to inquire why the medical staff had not sent the Decedent to have a consult with a neurosurgeon (pursuant to the recommendation of Dr. Taboada), and why they had not cleaned the wound from his thumb surgery or started his post-operation physical therapy (pursuant to Dr. Shakir's instructions).  On August 20, Ms. Reed called Ms. Lloyd-Jones to say that she had spoken to Dr. Pomerantz about following up on the referral to a neurosurgeon.

67.     Meanwhile, the Decedent had requested several times via JPAY to see Dr. Pomerantz for an appointment given that the Decedent was becoming more and more concerned about his condition.  By this time, he was having around 25 "partial seizures" a day, despite the anti-seizure medication that he was receiving.

68.     On August 23, 2018, the Decedent went to the infirmary at Southern State Correctional Facility in an attempt to have his thumb cleaned and cared for.  It had been seven weeks since his surgery, and the wound became infected because it had never been fully cleaned. In fact, his thumb was in a "grotesque" state, and his wrist was immovable due to the stiffness of the cast.

69.     Later that day, the Decedent was instructed to return to the infirmary to meet with Dr. Pomerantz.   During that meeting, the Decedent learned that his consult with the neurosurgeon was not scheduled to take place until nearly three weeks later, on September 12. However, he suffered another seizure, and that and the constant phone calls made by Linda Lloyd-Jones to the patient advocate, Ms. Reed, convinced Dr. Pomerantz to order a "non-emergent" medical trip for the Decedent to finally see a neurosurgeon at University Hospital in Newark.

70.     Thus, the Decedent was transferred to the emergency room at University Hospital for another CT head scan and an MRI.  Upon reviewing the tests, the Decedent was immediately scheduled for surgery to have the brain tumor removed.  The updated testing showed that the tumor had *doubled in size* since the original CT scan had been taken in June.

71.     On August 27, 2018, the Decedent underwent brain surgery and the tumor was fully removed.  Amanda Carpenter, M.D., who at the time was a resident in neurological surgery, explained to the Decedent's family after the surgery that he did not have meningioma, and that the tumor was very aggressive and malignant (cancerous).  Dr. Carpenter explained that the Decedent would need an oncologist and would need to be scheduled for radiation and chemotherapy.

72.     Based on the biopsy results, the Decedent had a malignant "Grade IV" glioblastoma, which is an aggressive type of cancer that occurs in the brain.  Research suggests early detection of this form of brain cancer can have a major impact on the life expectancy of the patient.  In this case, between the time of the original CT scan on June 29 and the brain surgery on August 27, the mass on the Decedent's brain grew significantly.

73.     On August 31, 2018, the Decedent was discharged from the hospital and was admitted to yet another facility, East Jersey State Prison, in Avenel, New Jersey.

74.     On September 6, 2018, the Decedent had a video consultation with Scott D. Miller, M.D., an orthopedic surgeon, to examine his thumb, as the Decedent was experiencing soft tissue swelling and diminished mobility.  Dr. Miller recommended that a new x-ray be taken of the thumb.  Dr. Miller further noted: "The patient could be referred to any one of the multiple clinics at New Jersey State Prison that occur every month for follow[-]up.  I do not understand the delay and waiting almost 2 months following surgery to schedule what should have been a 2-week routine follow-up appointment."

75.     On September 20, 2018, the Decedent saw the hand surgeon from his original surgery, Dr. Shakir, who advised the Decedent that he would need a follow up.  Dr. Shakir noted on the patient chart that "there is going to be significant limitation in his range of motion on a permanent basis due to this injury and immobilization."   Dr. Shakir further wrote: "This is now almost 3 months post[-]op and this is his first clinic visit.  Patient should receive physical therapy immediately after surgery."

76.     On October 1, 2018, a second surgery was performed on the Decedent's hand.

77.     On October 15, 2018, the Decedent began a 30-day regimen of radiation therapy treatment for his cancer.

78.     The Decedent was released from prison in 2019.  His doctors advised him that he did not have long to live soon thereafter.

79.     The Decedent died of brain cancer on June 20, 2020.

80.     As a direct and proximate result of the intentional and negligent acts of the Defendants, the Decedent suffered serious and severe injuries which resulted in his death and Plaintiff was damaged.

81.     Plaintiff institutes this action for compensatory and punitive damages arising out of the unlawful actions and conduct of Defendants who, acting under color of state law and under authority, custom and usage violated the civil rights of the Decedent protected by and secured under the Federal Constitution, 42 U.S.C. § 1983, as well as the New Jersey State Constitution, 10 N.J.S.A. 6-1. et seq.

82.     Plaintiff also institutes this action pursuant to the common law and statutory laws of the State of New Jersey for damages arising by reason of pain of suffering, negligence, failure to have a proper nursing plan, failure to properly hire, train and supervise, failure of operational decision making, failure to properly diagnose and treat, failure to render medical aid, abuse of authority, failure to intervene, and failure to protect, among other acts of negligence and misconduct.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

### FIRST CLAIM

**Violation of Federal Constitutional Rights – 42 U.S.C. § 1983**
**Deliberate Indifference to Serious Medical Needs**

83.     Plaintiff reavers the above paragraphs as though fully set forth herein.

84.     Defendants, as state actors, owed a duty to the Decedent, as an inmate in the NJDOC, to assure that necessary and adequate treatment was given to the Decedent for his medical needs.

85.     As alleged in detail above, the Decedent had serious medical needs while he was an inmate in the NJDOC facilities.  the Decedent had a dislocated and fractured right thumb caused by his seizure on June 12, 2018.  In addition, the Decedent continued to suffer seizures that were caused by an aggressive and malignant tumor in his brain.

86.     Defendants Sumalatha Mannava, M.D., Sandra Connolly, M.D., Jeffrey Pomerantz, D.O., Bharatkumar Patel, M.D., and Sherita Latimore-Collier, M.D., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., and Connie Purcell, R.N. (the "Treating Defendants") showed deliberate indifference to those serious medical needs.

87.     As detailed above, the Treating Defendants knew that the Decedent faced a substantial risk of serious harm and failed to take reasonable steps to avoid the harm.

88.     The Decedent experienced multiple seizures, migraine aura symptoms, and feelings of tremors on the right side of his body, but Defendants Sumalatha Mannava, M.D. and Sandra Connolly, M.D. delayed sending the Decedent for testing for several weeks, in deliberate indifference to his serious medical needs.  In fact, Dr. Connolly specifically and discriminatorily belittled the Decedent's injuries, stating that they were "suspicious for trauma related to an assault/fight" despite clear and obvious evidence to the contrary.

89.     When a CT head scan was finally performed on the Decedent on June 29, 2018, the scan showed aa "1.8 cm hyperdense mass" on the Decedent's brain.  Yet, the doctors who were responsible for treating the Decedent -- Sandra Connolly, M.D., Jeffrey Pomerantz, D.O., Bharatkumar Patel, M.D., and Sherita Latimore-Collier, M.D. – delayed sending the Decedent

-19-

for follow-up testing and consultation with a neurologist and neurosurgeon, again in deliberate indifference to the Decedent's serious medical needs. Indeed, it was not until some *two months* after the CT scan that the Decedent was finally sent to consult with a neurosurgeon – during which time the lesion (tumor) on the Decedent's brain had doubled in size.

90.     The neurosurgeon immediately scheduled surgery and removed the tumor from the Decedent's brain on August 27, 2018, but it was too late. The tumor was aggressive and malignant. As a result of Defendants Sumalatha Mannava, M.D., Sandra Connolly, M.D., Jeffrey Pomerantz, D.O., Bharatkumar Patel, M.D., and Sherita Latimore-Collier, M.D.'s deliberate indifference to the Decedent's serious medical needs.

91.     By reason of the foregoing, and as a direct and proximate result of Defendants' actions, the Decedent sustained serious and severe injuries that resulted in his death.

92.     Defendants also showed deliberate indifference to the Decedent's thumb fracture.

93.     Defendants Sumalatha Mannava, M.D. and Sandra Connolly, M.D. delayed sending the Decedent for treatment of his thumb, in deliberate indifference to his medical needs.

94.     The orthopedic surgeon who performed surgery on the Decedent's thumb wanted the Decedent to return for a follow-up visit in two weeks, and for the Decedent to begin a physical therapy program. However, there was no post-operation follow-up after the hand surgery, nor was there any physical therapy.

95.     In fact, the doctors and nurses at Southern State Correctional Facility – including Jeffrey Pomerantz, D.O., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., and Connie Purcell, R.N. – failed to remove the cast on the Decedent's right hand or clean the wound.

96.     The wound ultimately became infected and started to ooze pus and smell. Moreover, the pins inserted into the Decedent's thumb started to push their way out through his skin.   Defendants Jeffrey Pomerantz, D.O., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., and Connie Purcell, R.N. took no steps to treat his infection, clean his wounds, or provide proper post-surgical therapy, in deliberate indifference to the Decedent's serious medical needs.

97.     As a result of Defendants Jeffrey Pomerantz, D.O., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., and Connie Purcell, R.N.'s deliberate indifference to the Decedent's medical needs, when the Decedent finally saw the orthopedic surgeon, he was told that he would have "significant limitation in his range of motion on a permanent basis." Indeed, Dr. Scott Miller, the orthopedic surgeon who had a video consultation with the Decedent on September 6, 2018, noted that: "I do not understand the delay and waiting almost 2 months following surgery to schedule what should have been a 2-week routine follow-up appointment."

98.     Defendants' deliberate indifference to the Decedent's serious medical needs deprived him of his right to be free from cruel and unusual punishment as secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.   Such deliberate indifference has resulted in actual physical and medical harm to the Decedent.

99.     At all relevant times herein, the above described acts were committed by Defendants under color of state law within the authority and scope of the Defendants' work for the State of New Jersey and/or the NJDOC.

100.     By reason of the foregoing and wrongful death of the Decedent, Plaintiff has been damaged.

101.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral, burial and other expense.

102.    By reason of the foregoing and wrongful death, the Decedent has suffered pain and suffering, emotional distress and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment in his favor against the Treating Defendants, jointly and severally, awarding him damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## SECOND CLAIM

### Violation of Federal Constitutional Rights – 42 U.S.C. § 1983
### Supervisory Liability

103.    Plaintiff reavers the above paragraphs as though fully set forth herein.

104.    At the time of the incidents described above, Acting Commissioner Marcus O. Hicks, Administrator George Robinson, Administrator John Powell, and Administrator C. Ray Hughes (the "Supervisory Defendants") were each responsible for the development, promulgation, and implementation of policies, customs, or practices for the correctional facilities within the NJDOC at which the Decedent was housed.  Such policies, customs, or practices caused violations of the Decedent's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution to be free of cruel and unusual punishment.

105.    Specifically, the Supervisory Defendants have implemented policies, customs, or practices at the NJDOC correctional facilities that cause significant and material delays to the treatment of inmates' serious medical needs.  They very clearly inadequately trained those below them in their responsibilities related to administration of adequate medical care in the facilities

they were responsible for and failed to properly supervise their performance. This failure was magnified by failures in operational decisions related to the medical care of inmates at these facilities.

106.   The clear and utter failure of the Supervisory Defendants to train and supervise is clearly evidenced by the horrific track record of these facilities, most recently exposed during the COVID-19 pandemic, but previously noted in the press, which exposed the high number of deaths in New Jersey jails and the lack of accountability and even basic record keeping related thereto.

107.   In this case, the Decedent had his initial seizure and showed "abnormal" neurological signs on June 12, 2018. Although his records show that a CT head scan was ordered the next day, the Decedent was not actually taken for a CT head scan until June 29, over two weeks later. The radiologist who read the CT scan noted that the Decedent had a mass lesion on his brain and recommended an MRI test for further evaluation. But the Decedent was not actually taken for an MRI until two weeks later, on July 11. Based on the MRI results, which confirmed that there was a tumor on the Decedent's brain, the neurologist recommended that the Decedent consult with a neurosurgeon for brain surgery. However, despite repeated requests for action by the Decedent and his mother, the Decedent was not taken to see the neurosurgeon until nearly six weeks later, on August 23. Thus, by the time that the Decedent finally underwent surgery to remove the cancerous tumor, it had doubled in size since the initial CT head scan.

108.   Prisoners with medical needs are at the mercy of the correctional facilities to provide adequate medical care. Here, the medical staff at the prisons where the Decedent was confined plainly knew that he had a life-threatening brain tumor. Yet there was no urgency with respect to the Decedent's care. He was not taken to the hospital for many weeks, despite the

increased frequency of his seizures and his complaints of numbness and tremors throughout the right side of his body.  Even when tests and appointments were ordered, nobody actually did anything.  The only reason the Decedent was taken to University Hospital on August 23 to meet with the neurosurgeon was because of the Decedent's constant inquiries and complaints to the NJDOC prison liaison.  The Supervisory Defendants seem to have no trouble transferring inmates like the Decedent to and from different institutions within the NJDOC (as the Decedent was housed in four separate institutions from June to September 2018 alone) – but the policies, customs, or practices implemented by the Supervisory Defendants impeded the Decedent from being promptly transferred to a hospital for emergent testing and treatment for his cancerous brain tumor.

109.    The same is true of the way the Decedent was treated for his thumb fracture.  Dr. Scott Miller, the orthopedic surgeon who had a video consultation with the Decedent on September 6, 2018, noted that: "I do not understand the delay and waiting almost 2 months following surgery to schedule what should have been a 2-week routine follow-up appointment." Dr. Miller did not understand the long delay for the Decedent's post-operation treatment because there is no good explanation for such a long delay – other than the fact that the Supervisory Defendants have implemented policies, customs, or practices that led to such an explained delay.

110.    The Supervisory Defendants' deliberate indifference to the Decedent's serious medical needs has resulted in actual physical and medical harm to the Decedent.  As explained above, because of the aggressive and malignant nature of the tumor that was on his brain and as a direct and proximate result of Defendants' negligence, the Decedent sustained serious and severe injuries that resulted in his death.

111.    At all relevant times herein, the above described acts were committed by the Supervisory Defendants under color of state law within the authority and scope of the Supervisory Defendants' employment with the State of New Jersey and/or the NJDOC.

112.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff has been damaged.

113.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral, burial and other expense.

114.    By reason of the foregoing and wrongful death, the Decedent has suffered pain and suffering, emotional distress and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment in its favor against the Supervising Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## <u>THIRD CLAIM</u>

### Violation of State Constitutional Rights

115.    Plaintiff reavers the above paragraphs as though fully set forth herein.

116.    The New Jersey Civil Rights Act provides, in part, that "[a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges, or immunities secured by the Constitution or laws of this State . . . may bring a civil action for damages and for injunctive or other appropriate relief." *N.J.S.A.* 10:6-2(c).

117.    At all relevant times herein, Defendants were acting under color of law under the New Jersey State Constitution, statutes, laws, charters, rules, regulations, customs, usages, and practices of the subject governmental departments, agencies, and entities, and within the scope of their authority as supervisors, employees, officers, and/or agents of the NJDOC.

118.    At all relevant times herein, as described in detail above, Defendants acted with deliberate and conscious indifference to the Decedent's constitutional rights by failing to provide medical treatment for the Decedent's serious medical needs.

119.    Defendants' deliberate indifference to the Decedent's serious medical needs deprived him of his right to be free from cruel and unusual punishment as secured to him under Article I, Section 12 of the New Jersey State Constitution.   Such deliberate indifference has resulted in actual physical and medical harm to the Decedent as described in detail above.

120.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff has been damaged.

121.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral, burial and other expense.

122.    By reason of the foregoing and wrongful death, the Decedent has suffered pain and suffering, emotional distress and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment in his favor against Defendants, jointly and severally, awarding him damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## FOURTH CLAIM

### Medical Negligence

123.    Plaintiff reavers the above paragraphs as though fully set forth herein.

124.    At all relevant times, Sumalatha Mannava, M.D., Sandra Connolly, M.D., Jeffrey Pomerantz, D.O., Bharatkumar Patel, M.D., Sherita Latimore-Collier, M.D., Marcia Douglas, R.N., Poonam Malani, R.N., Darlene Sosa, R.N., and Connie Purcell, R.N (the "Medical Defendants") were licensed doctors, nurses, or specialists who treated the Decedent, and professed to possess the requisite skill, training, knowledge, and judgment in the field of nursing and medicine and provision of health care services to provide proper and reasonable care for the health care needs of the Decedent.

125.    Beginning with his seizure on June 12, 2018, the Decedent suffered a dislocated and fractured right thumb.

126.    Beginning with his seizure on June 12, 2018 through his brain surgery on August 27, 2018, the Decedent was suffering with a malignant brain tumor.

127.    During that period, the Medical Defendants had a duty to undertake and provide care to the Decedent, and to treat, test, warn, and interpret tests and procedures in a timely, proper, and accurate fashion, in accordance with accepted medical standards of practice.

128.    During the aforesaid period, the Medical Defendants failed to satisfy their duties, deviated from standards practice, and otherwise were negligent in failing to properly treat his thumb injury (both before and after surgery) and by proximately causing a delay in diagnosis and treatment of the Decedent's cancerous brain tumor condition and proximately causing injuries to him.

129.    As a further direct and proximate result of the Medical Defendants' negligence, the Decedent incurred pain and suffering, permanent injury, a decrease in his life expectancy, and incurred other damages that resulted in his death

130.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff has been damaged.

131.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral, burial and other expense.

132.    By reason of the foregoing and wrongful death, the Decedent has suffered pain and suffering, emotional distress and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment in his favor against the Medical Defendants, jointly and severally, awarding him damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## FIFTH CLAIM

### Intentional Infliction of Emotional Distress

133.    Plaintiff reavers the above paragraphs as though fully set forth herein.

134.    Defendants collectively and individually engaged in actions which were intended to, and which did, inflict severe emotional trauma upon the Decedent.

135.    The Decedent was subjected to intentional infliction of emotion distress by the Defendants' refusal to provide necessary medical testing and treatment and aid to the Decedent despite his obvious dislocation and fracture of his right thumb, the obvious signs of neurological problems evidenced by his repeated seizures, and by the Defendants' refusal to transfer the

Decedent to a hospital or other appropriate medical facility to test and treat those conditions, and the other actions of Defendants described above.   The emotional distress was severe and outrageous.

136.   The emotional distress was of such character that no reasonable person could be expected to endure it.

137.   As a direct and proximate result of Defendants' actions as described above, Plaintiff and the Decedent were damaged.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## SIXTH CLAIM

### Civil Conspiracy

138.   Plaintiff reavers the above paragraphs as though fully set forth herein.

139.   Defendants, each and every one of them, did conspire, act in concert together, and agree among themselves, to cause injury and damage to and commit unlawful acts against the Decedent, namely: abuse their authority and abuse process against the Decedent, and to injure, damage, intentionally cause emotional distress to, the Decedent.

140.   Each of the Defendants understood the objectives of the conspiracy scheme and accepted them, and agreed, implicitly or explicitly, to each do his part to further them.

141.   The conspiracy included knowledge and agreement to cause emotional distress to, fail to follow procedures with regard to, and fail to provide medical treatment and aid to the Decedent, without cause.

142.   By reason of the foregoing, and as a direct and proximate result of the conspiracy of and the actions of Defendants as described above, Plaintiff and the Decedent suffered emotional distress, anguish and other damages.

143.   By reason of the foregoing, Plaintiff and the Decedent have been damaged.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## SEVENTH CLAIM

### Abuse of Process

144.   Plaintiff reavers the above paragraphs as though fully set forth herein.

145.   The actions of Defendants as described above constitute an abuse of process.

146.   By reason of the foregoing, and as a direct and proximate result of the abuse of process of and the actions of Defendants as described above, Plaintiff and the Decedent suffered emotional distress, anguish and other damages.

**WHEREFORE,** Plaintiff demands judgment in their favor against Defendants, jointly and severally, awarding them damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## EIGHTH CLAIM

### Failure to Provide Medical Care

147.   Plaintiff reavers the above paragraphs as though fully set forth herein.

148.    Defendants failed to provide proper medical care to the Decedent as described above.

149.    The actions of the Defendants constitute a failure to provide proper care to the Decedent as described above in violation of N.J.S.A. 30:13-1 et. seq.

150.    As a direct and proximate result of the actions of Defendants, Plaintiff and the Decedent have suffered damages.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## <u>NINETH CLAIM</u>

### Violation of New Jersey Law Against Discrimination

151.    Plaintiff reavers the above paragraphs as though fully set forth herein.

152.    The New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-12(f), makes it unlawful for any superintendent, agent, or employee of any "place of public accommodation," directly or indirectly, to refuse, withhold from or deny to any person:

> any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, or directly or indirectly to publish, circulate, issue, display, post or mail any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, or privileges of any such place will be refused, withheld from, or denied to any person on account of the race, creed, color, . . . of such person.

153.    Northern State Prison, Bayside State Prison, and Southern State Correctional Facility are all places of public accommodation.

154.    The Decedent was a Hispanic male of Panamanian, African American and Caucasian decent.

155.    During the Decedent's time at the above-referenced facilities, necessary and life-threatening medical services were withheld from the Decedent because of his race, creed, or color.

156.    As set forth in detail above, the Decedent experienced multiple seizures, migraine aura symptoms, and feelings of tremors on the right side of his body, but Defendants inexplicably delayed sending the Decedent for medical testing.  When a CT head scan was finally performed on the Decedent and showed that the Decedent had a mass lesion on his brain, Defendants then delayed sending the Decedent for follow-up testing and consultation with a neurologist and neurosurgeon.  It was not until some *two months* after the CT scan that the Decedent was finally sent to consult with a neurosurgeon – during which time the lesion (tumor) on the Decedent's brain had doubled in size.  Defendants also showed complete indifference to the Decedent's thumb fracture, as described above.

157.    Despite the fact that the Decedent had a seizure on June 12, 2018 that was witnessed by his cellmate, which caused swelling above the Decedent's right eye and right cheek bone areas, trace foaming on the Decedent's lips, and caused the Decedent to have an "abnormal" gait and balance, the doctor who treated the Decedent at Northern State Prison, Defendant Sandra Connolly, M.D., thought the Decedent was lying about having a seizure.  Dr. Connolly, who is white, told the prison's Assistant Superintended, Anthony Gangi, that she did not believe the Decedent had suffered a seizure or that he fell to the floor.  Rather, she believed that his injuries were "suspicious for trauma related to an assault/fight."  Dr. Connolly's beliefs were influenced by the Decedent's race, and her plainly erroneous and unjustified belief that the

Decedent was somehow lying about his seizure would have grave consequences for the Decedent – as no tests would be conducted on him with respect to his seizure for several weeks, and surgery for the cancerous tumor on the Decedent's brain ultimately would not be performed for over two months.

158.   The Decedent's race as a Panamanian American was a factor in the Defendants' deliberate indifference to the Decedent's serious medical needs.

159.   Defendants' actions (and failure to act) constitutes unlawful discrimination in a place of public accommodation in violation of the NJLAD.

160.   As a result of Defendants' violations of the NJLAD, Plaintiff and the Decedent were damaged.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## TENTH CLAIM

### Punitive Damages

161.   Plaintiff reavers the above paragraphs as though fully set forth herein.

162.   Defendants' actions were egregious, intentional and/or they acted with deliberate indifference to the Deceased's life and well-being.

163.   Such egregious actions are sufficient for punitive damages.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory

penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## ELEVENTH CLAIM

### Wrongful Death

164.    Plaintiff reavers the above paragraphs as though fully set forth herein.

165.    The actions of Defendants described above constituted a wrongful death of the Decedent.

166.    By reason of the foregoing and as a direct and proximate result of Defendants' wrongful actions, the Decedent sustained serious and severe injuries that resulted in his death.

167.    The Decedent is survived through Plaintiff.

168.    As a direct and proximate result of the actions of Defendants as described above, Plaintiff has been damaged and those in it have been permanently deprived of the services, society, care, companionship, support and guidance of the Decedent for the life expectantly of the Decedent.

169.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff has been damaged.

170.    By reason of the foregoing and wrongful death of the Decedent, Plaintiff suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral, burial and other expense.

171.    By reason of the foregoing and wrongful death, the Decedent has suffered pain and suffering, emotional distress and loss of enjoyment of life.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory

penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

## **TWELFTH CLAIM**

### **Survivorship**

172.    Plaintiff reavers the above paragraphs as though fully set forth herein.

173.    The actions of Defendants described above constituted a wrongful death of the Decedent.

174.    Defendants' actions were egregious, intentional and/or they acted with deliberate indifference to the Deceased's life and well-being.

175.    The Decedent is survived through Plaintiff.

176.    By reason of the foregoing, and as a direct and proximate result of Defendants' wrongful actions, the Decedent sustained serious and severe injuries that resulted in his death.

177.    As a direct and proximate result of the negligence and wrongful actions as described above, the Decedent was caused to suffer severe, painful and permanent personal injuries, mental anguish and great physical pain, ultimately resulting in loss of life.

178.    By reason of the foregoing and wrongful death of the Decedent, the Decedent and Plaintiff have been damaged.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants, jointly and severally, awarding it damages, including incidental and consequential damages, statutory penalties, attorneys' fees, punitive damages, plus interest, costs of suit, and for other such relief as the Court may deem just, equitable, and proper.

Respectfully submitted,

**SMITH + SCHWARTZSTEIN LLC**
4 Chatham Road
Summit, New Jersey 07901
Phone:  973-206-1725
Fax:  973.794.2589
E-mail: andrew@sslawfirmllc.com
*Attorneys for Plaintiff*


By: /s/  Andrew B. Smith

Dated:  November 11, 2020

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

**SMITH + SCHWARTZSTEIN LLC**
4 Chatham Road
Summit, New Jersey 07901
Phone:  973-206-1725
Fax:  973.794.2589
E-mail: andrew@sslawfirmllc.com
*Attorneys for Plaintiff*

By:  /s/  Andrew B. Smith

Dated:  November 11, 2020

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

The undersigned hereby certifies that the matter in controversy is not the subject of any

other action pending in any court, arbitration proceeding, or any administrative proceeding.

**SMITH + SCHWARTZSTEIN LLC**
4 Chatham Road
Summit, New Jersey 07901
Phone:  973-206-1725
Fax:  973.794.2589
E-mail: andrew@sslawfirmllc.com
*Attorneys for Plaintiff*


By:  /s/  Andrew B. Smith

Dated:  November 11, 2020